**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:12-cr-00141-HDM-VPC |
| Plaintiff, | |
| vs. | ORDER |
| ISIDORO GUEVARA-GARCIA, | |
| Defendant. | |

Defendant Isidoro Guevara-Garcia ("defendant") is charged in two separate but related indictments. The first indictment, against defendant and three co-defendants – Uvaldo Tostado, Alvaro Meraz, and Juan Manuel Valenzuela, Jr. – charges defendant with: (1) conspiracy to possess with intent to distribute cocaine; (2) illegal use of a communication facility; and (3) forfeiture of $3,500. The second indictment charges possession of a firearm by an unlawful alien. On July 3, 2013, defendant filed a motion to

1

suppress (#115), adopting in full the arguments made by Tostado in a motion to suppress he filed on May 15, 2013 (#78, #94). The government has filed its response (#120), adopting the arguments it made in opposition to Tostado's motion (#92).

In August 2012, the DEA learned from a source of information that Tostado was a cocaine and methamphetamine dealer in Reno and Incline Village, Nevada. On September 17, 2012, and September 26, 2012, a confidential source ("CS") purchased one-ounce quantities of cocaine from Tostado. On October 9, 2012, and October 16, 2012, the government applied for and obtained pen registers/trap and trace and GPS data location information for Tostado's cell phone. On October 30, 2012, the CS purchased three ounces of methamphetamine from Tostado and Manuel Andres Valenzuela. On November 26, 2012, the DEA applied for a wiretap of Tostado's cell phone, which was granted on November 28, 2012. On December 14, 2012, Tostado was arrested in Modesto, California, along with Meraz and seven ounces of powder cocaine.

On January 2, 2013, defendant was added to the cocaine indictment and a warrant was issued for his arrest. Defendant was arrested on January 3, 2013, outside of his home. During a search of defendant's home, agents located two firearms.

Defendant moves to suppress evidence obtained as a result of the wiretap of Tostado's phone. Specifically, the wiretap allowed the government to intercept four phone calls between defendant and Tostado discussing delivery of drugs by Tostado to defendant. Defendant argues this is the only evidence the government has against him for the cocaine indictment. Further, defendant was added to the cocaine indictment and arrested as a result of this

evidence; thus, the two firearms found in defendant's possession were found only because of the wiretap, as well. Accordingly, if the motion to suppress is granted, the government's case against defendant in both indictments would be effectively precluded.

**I. Standing**

As an initial matter, defendant has standing to challenge the wiretap, which the government has essentially conceded. (*See* Doc. #110). Under 18 U.S.C. § 2518(1)(a), "[a]ny aggrieved person in any trial before any court . . . of the United States . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that . . . the order of authorization or approval under which it was intercepted is insufficient on its face." "'[A]ggrieved person' means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." *Id.* § 2510(11). Defendant was a party to a number of the communications intercepted as a result of the wiretap. He has standing.

**II. Motion to Suppress**

Under 18 U.S.C. § 2518, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). A wiretap is properly issued only where "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Thus, to obtain a wiretap, the government must prove necessity. *United States v.*

*Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

Defendant argues that the affidavit failed to establish the requisite necessity; he does not argue that the affidavit failed to comply with § 2518 in any other respect. Specifically, defendant adopts Tostado's argument that the application did not show traditional investigative methods were insufficient because they had already caught Tostado in the act, and that the goals of the investigation were overly broad and possibly pretextual – the real purpose being attribution of more drugs to – and addition of more charges against – Tostado, as evidenced by the termination of the wiretap before achieving any of those goals. The government responds that the application sufficiently set forth in case-specific detail sixteen investigative techniques that were either used or determined not likely to be successful, that no traditional techniques would have been able to achieve to broader goals of the investigation, and that its goals were proper. In particular, the government points out that rather than not being necessary as to defendant, the wiretap was critical to bring its case against defendant; without the wiretap, the government had "limited evidence" of defendant's involvement. The government further argues that the ultimate result of the wiretap has no relevance as to whether the original purpose of the investigation was legitimate.

In reviewing a wiretap application, the Ninth Circuit first considers *de novo* whether the application is "supported by a full and complete statement of the facts in compliance with 18 U.S.C. § 2518(1)(c)," and next reviews "for abuse of discretion the issuing judge's conclusion that the wiretap was necessary." *United States*

*v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008).[1]

**A. Full and Complete Statement**

Under 18 U.S.C. § 2518, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). An application that "contains only generalized statements that would be true of any narcotics investigation" and "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures" is insufficient. *Blackmon*, 273 F.3d at 1208, 1210. An affidavit must do more than simply recite the inherent limitations of investigative techniques; it must explain in case-specific detail why they would not work in that particular investigation. *See Rivera*, 527 F.3d at 899. However, "[t]he presence of [some] conclusory language in the affidavit will not negate a finding of necessity if the affidavit, as a whole, alleges sufficient facts showing necessity." *United States v. Garcia-Villalba*, 585 F.3d 1223, 1230 (9th Cir. 2009) (quoting *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990)).[2]

---

[1] "Whether other investigative procedures have been exhausted or why they reasonably appear to be unlikely to succeed if attempted, is reviewed *de novo* . . . . A district court's denial of a motion to suppress evidence is reviewed *de novo* and underlying factual issues are reviewed for clear error." *United States v. Lynch*, 437 F.3d 902, 912 (9th Cir. 2006).

[2] A court considering a motion to suppress wiretap evidence must also examine the application "to see whether it contains material misstatements or omissions regarding necessity." *Blackmon*, 273 F.3d at 1207. "If an application contains inaccuracies or significant omissions, the court must determine the facts relying on credible evidence produced at the suppression hearing to determine whether a 'reasonable [issuing] judge could have denied the application because necessity for the wiretap had not been shown.'" *Id.* at 1208. "To obtain a *Franks* hearing, defendants must make a preliminary

The affidavit submitted in support of the wiretap application discusses 16 investigative techniques that the government used or determined were not likely to succeed based on the specific facts of this case: (1) confidential sources (used); (2) controlled purchases (used); (3) undercover operations (not likely to succeed); (4) physical surveillance (used); (5) search warrants (not likely to succeed); (6) witness interviews (used); (7) grand jury subpoenas (not likely to succeed); (8) pole cameras (used); (9) tracking devices (not likely to succeed); (10) GPS location data of defendant's phone (used); (11) toll analysis, pen registers, and trap and trace devices (used); (12) covert recording devices (used); (13) trash searches (not likely to succeed); (14) financial investigations – public records checks (used); (15) mail cover (not likely to succeed); and (16) ongoing investigations of suspected co-conspirators (used). (Gettel Aff. 27-43). Defendant does not identify any methods that should have been discussed but were not. The affidavit discussed a sufficient number of

---

showing that the wiretap applications contained material misrepresentations or omissions." *United States v. Gonzalez*, *Inc.*, 412 F.3d 1102, 1110 (9th Cir. 2005), *amended on other grounds by United States v. Gonzalez, Inc.*, 437 F.3d 854 (9th Cir. 2006).

The defendant has made no explicit claim of material misrepresentations or omissions, nor did he request a *Franks* hearing. However, Tostado had asserted that the affidavit's conclusion that the CS could not penetrate the drug-trafficking organization ("DTO") at higher levels is belied by DEA investigative reports in discovery showing the CS was in regular communication with Tostado and regularly arranging meetings. To the extent this was to suggest misrepresentations in the affidavit, neither defendant has made any preliminary showing justifying a *Franks* hearing. There is only the conclusory assertion and no evidence – not even the supposed DEA investigative reports showing the interactions between the CS and Tostado. Further, if even this conclusory assertion were evidence, the mere fact the CS and Tostado communicated and arranged meetings does not show that the CS was in a position to penetrate the DTO. To the extent defendant attempts to raise a *Franks* issue, he has not made any preliminary showing that the wiretap application contained material misrepresentations or omissions.

traditional investigative techniques in explaining why none of them could meet the goals of the investigation.

While the number of techniques discussed is adequate, the affidavit must also contain sufficient case-specific information explaining why those techniques are of limited use in this case. Defendant targets as insufficient the affidavit's discussion of: (1) sources of information (Def. Mot. 7:4-7); (2) confidential informants (Def. Mot. 7:4-7); (3) controlled purchases (Def. Mot. 7:4-7); (4) physical surveillance (Def. Mot. 7:4-7); (5) pen register/trap and trace/GPS data location (Def. Mot. 7:4-7); (6) undercover agents (Def. Mot. 10:10-11); and (7) grand jury subpoenas and search warrants (Def. Mot. 11:20-21).

As to confidential sources and sources of information, defendant relies on *Blackmon*. In *Blackmon*, the affidavit explained "that despite the successful employment of four informants during the . . . pre-wiretap investigation, these informants are insufficient to meet the broad investigative purpose here because they 'typically only possess limited knowledge concerning the scope of the criminal enterprise'" and that subjects like the defendant "'know that it is their best interest to reveal as little as possible to others concerning how their business is conducted . . . Therefore, without the evidence sought by the application, cooperating source information is insufficient to identify the entire criminal enterprise." *Blackmon*, 273 F.3d at 1210. The court held that "[t]hese statements would be true of most or all drug conspiracy investigations, and the limitations on the usefulness of informants, no matter how successful or potentially successful to the particular operation, would support the necessity

of a wiretap." *Id.*

Here, the affidavit explained that while the source of information had been able to provide information about the drug trafficking organization ("DTO"), he or she was not in a position to interact with Tostado or his associates because the SOI was not a drug user or trafficker. As to the CS, the affidavit explained that while he or she had been able to purchase drugs from Tostado, he or she had limited dialogue with Tostado and Tostado revealed limited facts to the CS. The CS had not obtained any information about the sources of supply or drug stash locations, and given the interactions between the CS and Tostado, it seemed he or she never would. While the statement offered some generic descriptions of the inherent limitations of confidential sources and sources of information, that was not all it offered. The conclusion as to the limits of the CS in this case were based on the facts of this case: the CS's historic interactions with Tostado. The description of the limitations of using a CS in this case therefore contained sufficient case-specific detail.

As to controlled purchases, the affidavit explained that while they had been used they had not revealed any information relevant to the other investigative purposes, including the sources of supply and other higher-level members of the DTO. Again, while there is some discussion of the generic limitations of this method, the affidavit explains specifically what information the controlled purchases had uncovered and what information they had not and would likely not, based on the facts of this case.

As to undercover operations, the affidavit states that such are unlikely to succeed based on the agent's knowledge of Mexican-

based DTOs operating in the Reno area. While somewhat general in nature, the affidavit still contains specific information about why, in this case, undercover officers could not infiltrate the DTO at a sufficiently high level to net higher level operators of the DTO: because the Reno area is a small community and because, based on the CS's experience with Tostado, any interactions with outsiders would likely remain at a relatively low level.

As to physical surveillance, the affidavit explained that based on surveillance already conducted in the case the targets appeared on alert to law enforcement presence. For that reason the agent did not believe surveillance could lead to the broader targets of the investigation. While much of it is conclusory, the statement explains each instance of physical surveillance and the information gleaned from it to show its limitations.

As to pen register/trap and trace/GPS data location, some of the statement is broadly applicable to all drug transactions and/or is a description of the inherent difficulties of the methods. However, the affidavit also specified why pen register/trap and trace was not effective in this case: the subscriber information and physical address for the phone believed to be used by Tostado were not accurate, so it was impossible to identify with certainty that the participants in the calls were the individuals listed as subscribers. And the affidavit explained that GPS location data was of limited usefulness in this case because such data gives only a general vicinity of a subject, and Tostado resided in an area with limited cellular tower resources (Incline Village), compounding the margin of error.

Finally, as to grand jury subpoenas and search warrants, the

defendant cites *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1114 (9th Cir. 2005), *amended on other grounds by United States v. Gonzalez, Inc.*, 437 F.3d 854 (9th Cir. 2006), which found insufficient the affidavit's rejection of such on the basis that "they would likely reveal the investigation to its targets." The court went on to say: "Such statements do not reasonably explain why traditional investigative tools are unlikely to succeed in a particular investigation, but are 'boilerplate conclusions that merely describe inherent limitations of normal investigative procedures,' which we have found insufficient to establish necessity." While the affidavit's discussion of grand jury subpoenas and search warrants here is mostly general and provides only minimal specifics, this is not dispositive if on the whole the affidavit contains enough facts demonstrating necessity. On the whole, the affidavit here contained sufficient facts for the issuing court to determine a wiretap's necessity.

The affidavit contained a full and complete statement in accordance with § 2518(1)(C). While some of its justifications were conclusory and broadly generic, as a whole there was sufficient case-specific information for the issuing court to determine the wiretap was necessary.

**B. Necessity**

The purpose of the necessity requirement "is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Blackmon*, 273 F.3d at 1207. "A district court must reject a wiretap application if law enforcement officers have not first attempted, without success, traditional investigative methods that

10

'easily suggest themselves and are potentially productive and not unduly dangerous.'" *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988). However, the government is not required to "exhaust every possible technique before resorting to wiretapping," *Gonzalez, Inc.*, 412 F.3d at 1113, and "[t]he necessity requirement can be satisfied by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." *Garcia-Villalba*, 585 F.3d at 1228. The court employs a "common sense approach" to determine the reasonableness of the government's good faith efforts to use traditional investigative techniques or the decision to forgo such based on unlikelihood of success of risk of danger. *Gonzalez, Inc.*, 412 F.3d at 1112.

Where the government is investigating a conspiracy, it is "entitled to more leeway in its investigative methods." *United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002). The Ninth Circuit has "'consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of ... other satellite conspirators.'" *Rivera*, 527 F.3d at 902.

"The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006). An effective case means evidence of guilt beyond a reasonable doubt and not merely evidence sufficient to secure an indictment. *Garcia-Villalba*, 585 F.3d at 1228.

11

In his motion, the defendant relies heavily on *Gonzalez, Inc.*, 412 F.3d 1102. In *Gonzalez, Inc.*, the Ninth Circuit affirmed the district court's determination that in an investigation of an alien smuggling operation, the application for a wiretap of the smuggler's office building had failed to establish the requisite necessity. Before seeking a wiretap, the government had conducted only the following investigations: (1) five days' worth of pen register analysis; (2) five days' worth of trap and trace analysis; and (3) limited physical surveillance of the office. The court held this "limited use of traditional methods does not establish that normal tools were sufficiently exhausted before the government requested a wiretap." *Id.* at 1112. The court further held that even if the government had not used "an ample array of traditional investigative tools" before seeking the wiretap, it "would have proven necessity had it reasonably attested that the unused tools were unlikely to succeed." *Id.* at 1114.

*Gonzalez, Inc.* is unpersuasive. Before seeking a wiretap, the government in this case did much more, including: (1) using a CS to conduct two controlled purchases; (2) physical surveillance of the target subjects during the controlled purchases and one day of surveillance of defendant's home; (3) interviews of CSs and sources of information; (4) mounting a pole camera at Tostado's residence; (5) GPS location data on Tostado's phone; (6) telephone toll records and pen register/trap and trace on Tostado's phone; (7) covert recording devices during the controlled purchases; and (8) public records checks for property, as well as Suspicious Activity Reports (SAR) and Currency Transaction Reports (CTR) checks. Moreover, the investigation was conducted for at least three months

before seeking the wiretap. The Ninth Circuit in *Gonzalez, Inc.* found the wiretap unnecessary in part because the government had not conducted a sufficient investigation before seeking it. *Gonzalez, Inc.* is thus easily distinguished from this case.

The defendant also argues that *Gonzalez, Inc.* stands for the proposition that use of confidential informants should not be rejected as an investigative method where they were successfully used earlier in the investigation. However, in *Gonzalez, Inc.* the government had used CIs earlier in the investigation with respect to a separate building but had not used any CIs with respect to the building that was subject of the contested wiretap. What the Ninth Circuit actually held was that because CIs had been used to successfully infiltrate the other building, the government should have attempted to use CIs before seeking a wiretap for the subject building. That is not the case here, where a CS was in fact used to gather information on the defendants' criminal activities. Further, the Ninth Circuit has held that "[a]ny previous success from the use of confidential informants is even less persuasive in the context of an investigation of a criminal conspiracy" and has "acknowledged the limitations of individual informants in such broad investigations and often upheld government requests for such wiretaps when large-scale investigations are under investigation." *United States v. Canales Gomez*, 358 F.3d 1221, 1225-26 (9th Cir. 2004). In that case, the court went on to state:

> Here, the government is to be commended for its interest in wiretap evidence, which, compared to the word of an informant either in the field or in court, is the gold standard when it comes to trustworthy evidence. The truth-seeking function of our courts is greatly enhanced when the evidence used is not tainted by its immediate informant source and has been cleansed of the baggage

13

>           that always comes with them. Moreover, wiretap evidence
>           out of the mouths of defendants is valuable corroboration
>           of informant testimony. Such evidence serves also to
>           ensure that what investigators are being told by
>           informants is accurate, a very valuable function that
>           guards against the indictment of the innocent.

*Id.* at 1227.

The defendant further argues that the CS could have continued to infiltrate the DTO as evidenced by the fact Tostado introduced him or her to another co-defendant. However, as noted earlier, the Ninth Circuit has "'consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of ... other satellite conspirators.'" *Rivera*, 527 F.3d at 902. The fact the CS met one other conspirator does not prove that he would be able to assist the government in locating other conspirators – or in locating the sources of supply, drug stash locations, or other things sought by the investigation. The CS was not a part of Tostado's organization, and any argument that he may have penetrated it is purely speculative. *See United States v. Aviles*, 170 F.3d 863, 867 (9th Cir. 1998) (cited and discussed in government's brief).

Defendant also argues that the CS was in constant communication with Tostado and so could have acquired information relevant to the broader goals of the investigation. However, as already noted, there is no indication that Tostado was sharing with the CS any useful information – or that he ever would. Relatedly, the defendant adopts Tostado's argument that because traditional investigative methods had been successful in the investigation, there was no need to resort to a wiretap. The defendant's argument

14

not only ignores the broader goals of the investigation, which the affidavit clearly shows were not being achieved by traditional methods, but also ignores his argument that the government would have had no evidence against him but for the wiretap.

Defendant also apparently adopts Tostado's argument that a wiretap was not necessary because physical surveillance would have led the government to Modesto, where Tostado was arrested with seven ounces of cocaine. Clearly this argument is inapplicable to defendant, because there has been no showing that surveillance would have led authorities to him.

Defendant also argues that many cases in which wiretaps were approved involved investigations of much larger drug trafficking organizations, citing *Rivera* and *United States v. Armenta*, 373 Fed. App'x 685, 689 (9th Cir. 2010). The government argues that it does not have to be investigating a massive conspiracy in order to obtain a wiretap. While it is true that most of the cases cited involved large DTOs and the large scale of the DTOs was acknowledged as a factor in favor of finding necessity, defendant has cited no case in which the size of the conspiracy was a reason for disapproving a wiretap. Nor, indeed, has the conspiracy in this case been proven to be smaller than those at issue in *Rivera* and *Armenta*. Even though only five people were netted as a result of the investigation, it remains clear that at least some and perhaps several more within the conspiracy remain at large.

Defendant also argues that the investigation lasted only two to three months (the evidence indicates the time period was approximately three to four months) before the government sought a wiretap, and that two to three months is not enough time to

15

establish that traditional investigative techniques were insufficient. The defendant argues that of all the cases cited by the parties, only two involved investigations that lasted less than six months and in both the wiretaps were disapproved. The government correctly argues that the case law does not set forth any minimum amount of time an investigation must last before a wiretap may be sought. While the length of time does seem to be a relevant factor to consider in determining whether traditional investigative techniques had failed, the essential question remains, however, whether traditional investigative methods had proven unhelpful in attaining the investigation's goals. Here, the affidavit was sufficient to support the wiretap and the issuing judge did not abuse his discretion in finding that a wiretap was necessary.

Defendant relies on *Blackmon*, 273 F.3d at 1211, and argues that to the extent the investigative techniques could not achieve the investigation's goals, those goals were overly broad. *Blackmon* is distinguishable. The affidavit in *Blackmon* provided only conclusory and generic justifications for the rejection of traditional investigative techniques. The affidavit here provides case-specific detail. Further, goals similar to those sought in this case have been upheld in other DTO investigations. *See Rivera*, 527 F.3d at 896-97 (wiretap application sought information about the full scope of DTO, the identities of those involved, including transporters and suppliers, and a money laundering operation); *Canales Gomez*, 358 F.3d at 1224 (application "sought to reveal the key personnel of the narcotic trafficking conspiracy, the identity of the main customers of the identified conspiracy,

the stash locations where cocaine was stored prior to distribution, and the management and disposition of financial proceeds generated by the organization's cocaine trafficking").

Finally, defendant adopts Tostado's argument suggesting the broad goals espoused in the application were pretextual because the government never pursued them, and that the government was really only after Tostado. Defendant cites nothing to suggest that inadequate results of a wiretap may be used to show that the wiretap was not properly authorized in the first place. Further, the government's intentions with respect to Tostado are irrelevant as to defendant.

The court concludes that the issuing judge did not abuse his discretion in finding the wiretap necessary. The government engaged in a wide array of investigative techniques before seeking the wiretap, methods that did not provide the government a way to progress beyond low level purchases from Tostado – and in particular obtained only limited evidence against defendant before the wiretap. While the government did not pursue all investigative methods, it is not required to. Further, the government is entitled to more leeway in its investigation of a conspiracy. Finally, the fact the government ultimately was unable to achieve the goals of its investigation does not prove those original goals were illegitimate or that the wiretap was unnecessary.

**Conclusion**

In accordance with the foregoing, the court concludes that the affidavit contained a full and complete statement and sufficiently established the necessity of a wiretap and that the court's

issuance of the Title III wiretap was not an abuse of discretion. The defendant's motion to suppress (#115) is therefore denied.

IT IS SO ORDERED.

DATED: This 25th day of July, 2013.

*[signature: Howard D. McKibben]*
UNITED STATES DISTRICT JUDGE